We have five cases on the docket today, four of which will be argued, excuse me, six cases on the docket today, four of which will be argued. We're going to start with the first case, Sunoco Partners. Oh wait, before I do that, I just want to say one thing. As you see, we have Judge Cunningham participating today by video. And sometimes when you participate by video, it can be hard to interrupt counsel and get your questions in. So I'm going to ask all of the attorneys today who are arguing to please be observant of when you see Judge Cunningham raise her hand. That will indicate that she'd like you to pause so that she could ask you a question. Thank you for that. Our first case today on the docket. Can I just for a second lift this up so I can see Judge Cunningham and your brief? Does that interfere with any of you? It does not. Okay, fine. Because that way, I couldn't see over the presiding judge's brief. How's that? Yeah, that's perfect. Hi. Excellent. Okay. So our first case for today is Sunoco Partners Marketing and Terminals LP versus Powder Springs Logistics LLC, appeal number 23-1218. Mr. Kevville, is that how, did I pronounce it correctly? Great. Proceed when you're ready. Thank you, Your Honor. May it please the court. In this case where the jury found all claims valid and willfully infringed, there are 71 profit-sharing agreements with 16 sophisticated companies that both sides' experts testified are comparable that are on the patents at issue, agreements under which Sunoco makes and uses the patented invention and shares the net profits, not the gross profits, the net profits. Sunoco and Magellan have the same, what they call BSA, profit-sharing agreement at one site that Magellan acquired, that's the perimeter site, and they negotiated the same terms for the other sites, but ultimately Magellan decided to, quote, keep dollars and do it themselves, and they were found to be willful infringers. Those BSA profit-sharing agreements are the established methodology by which the market valued the patented invention and no more. Those are comparable licenses. But the damages expert report was stricken with leave to supplement one to further support that the patents drive demand and the application of the entire market value rule, and two, to further apportion the BSAs. In a 34-page supplement, citing 735 pages of documents and 76 pages of deposition testimony, Ugon, the damages expert, did exactly that. And by further apportioning, he reduced the lost profits by 10% and the reasonable royalty by 4 to 7%. Oh, I see that Judge Cunningham has a question. Yes, Judge Cunningham. Counsel, do you agree that you are continuing to pursue a damages theory that at least has been rejected in part by this court previously? No. This is a different case with a different defendant, different infringing systems, different BSAs that were found the most economically comparable were applied in this case. Second, the Illinois case that you're on, Ugon's opinion, and then after trial, only disagreed with Panduit Factor 4. Only at issue was Panduit Factor 2 between the parties, whether there were non-infringing alternatives. The district court said, no, I find there are no non-infringing alternatives, but I find that the number is too high and I've only got two numbers, Ugon's and the other experts. And so the court then held here that that was not clear error for the judge to say, I won't rely on that damages number, meaning it was plausible in light of the record there. Further, Judge Cunningham, the order striking Ugon's original opinions in this case came out on January 2nd, 2020. The Chicago case came out, the judgment came out January 29th, 2020, citing that order as support. So this case impacted that case. Mr. Keville, what about the fact that the district court, when it talked about the amount, this is in the Illinois case, when it talked about the amount, it said its reasoning for why that was so was because its view that the BSA agreements did not accurately value the patents, didn't reflect the patent invention, the value of it, given that there were other things that were being supplied. Right, and the distinction here is after that happened and the Chicago judge had adopted from here, the court here gave leave to supplement. And so Ugon did that, and Ugon, in a detailed opinion, went through all the factors. Well, that's the whole question, right, is whether Ugon's supplement sufficiently apportioned, right? That is the big question here. And so Ugon did exactly what he was ordered to. He went through each of those services, and I'll talk to those in about a second, but he went through each of those services, he valued them, he said, here is the value I take out for two of these services. What is the value that he assigned to the trade secret? To the trade secret algorithm? Yes. No, he didn't assign a value to that, because that is, Sunoco kept the rights. This is not where Sunoco sells a system to them. Sunoco kept the rights to make and use, and the algorithm, the software, you can't have an automated blending system without software to run it. But that was already apportioned out, because what Ugon did, he had the option to either say, using our algorithm, how much would they have blended? Or, what they said is, the algorithm claimed is better. Ugon said, okay, I'll use your algorithm, your volumes. So by using their actual blend volumes, he apportioned out the better trade secret algorithm, because he used the volumes from the infringer, not the volumes that would have been created, had he used our algorithm. Sir, wasn't there a finding by the district court that you had failed to prove that the entire market value was attributable to the patents? Yes, and I believe that was clear error, because... Okay, so let's just stop right there. Okay. So let's assume I disagree with you, and that you failed to show that the entire market value was attributable to the patents. You know what that means? That means that there's value someplace else. Correct, and that's what Ugon did. And if there's value someplace else, the question is, was it properly apportioned? Right, and Ugon did that. That was the, in one part of his supplement, he said, here's the demand. The district court disagreed with you. Right, and I don't think at that point, where Ugon has looked at each one and valued each, it's not... How much, what was the value for helping people with their regulatory requirements? That's already factored out. That's already apportioned. How's that already apportioned? It's in the costs that are taken out from the net profits. Maybe what you ought to do is, one by one, go down the list of all the other things that are in the patent, like the million dollars that each Sunoco will pay to build the plant, right, and the cost of the fuel, the butane, all the things that are in it, other than, and the software. Okay, that's fine, and I would say, though, if you look at appendix 7508, Ugon talks about all the costs that are taken out of the agreement. Taken out? What's that? I'm sorry, I didn't... How does he take them out? Oh, because what happens here, Judge Covinger, is the invention is installed at the site. It makes a certain number of increased gasoline. Only that gasoline and nothing else... Well, the invention, it doesn't work that Sunoco comes and says, if you'd like us to do your blending for you, we'll do it. We'll build whatever is necessary to build. We'll build some tanks. Correct. If you've got a pipeline, we'll cut holes in the pipeline, and we'll build all this physical structure. Right. And then what we'll do is, we'll go and buy the butane, and we'll bring it in. So, butane has a value. Right. And then we're going to run this for you, and maybe with your own Sunoco's own personnel, down the line of the list. Correct. And then what happens is... Somebody comes along and doesn't want to have you build the plant, doesn't want these services. That's all, that's fact. Doesn't want your software. What happens if somebody doesn't want you? The defendant here obviously didn't want your software, your almost sort of like best mode algorithm. They had their own. Correct. And so, by using the volumes that they... All they really was access to your patents. Right. Sure. But there's an established methodology, and what all the cases say, either on royalty or lost profits, if there's an established licensing methodology, that's considered. Now, what Sunoco would have come in and said, okay, if you're going to do that, that puts extra risk on us. You're going to end up with lower volumes. And so, that's why you've gone by using their volumes, has already apportioned out the value of the trade secret algorithm. By using their volumes. Yes. Help me with the, who's the there? Magellan and Colonial. What do you mean when you use their volumes? Oh, I understand. So, you go and could have said, based on our trade secret algorithm, Magellan would have blended this amount, but Magellan used their own algorithm, which is less preferred. And so, if they had got a better license, they would have only been able to use that, and they would have blended less. What is the difference in volume? I don't know that I have that calculation at hand. What is the logic for why that difference in volume is a representation of the value of the trade secret to the people who entered into the BSAs with Sunoco? Because the only reason people entered into the BSAs was because of the patent, not for the algorithm. But the testimony they relied on... There is testimony in the record that says that parties entered into the BSAs for reasons other than the patent. Okay? There is testimony. And we have a district court judge who credited that testimony and relied on it. Right? Yeah. So, you can't just say there in a conclusory fashion, the reason why is because the BSAs are parties entered into the BSAs just because of the patent. We need to know in the report or whatnot. But you can't keep it at that high level if you're going to be persuasive today. Sure. I understand. If you look at Appendix 8233, Ugone was in his deposition talking about a declaration from third-party customer Chevron where they said the strength of the patent was why they entered. If you look at... This is Mr. Ugone saying that the strength of the patent is the reason why customers entered the agreement? This is Ugone saying he relied in part on a declaration from Chevron, a non-party customer, that said the strength of the patents were why they entered. But is that tantamount to that person, that third-party person, saying, well, the only value here is the patent, so I don't attribute any value to anything else in the license? That's the driver of demand issue, and that the patents were the sole reason people were there. As you said, Judge Clevenger, they could make their own algorithm, but the reason people said is, we want the patented invention because we believe the patented invention works better, and we'll take out all the costs. Right, but the patented invention works better than the fact that you've got your algorithm is irrelevant because that's not patented. Correct, but you asked what's the value of it. My point is, to whatever value there is that might be attributable, I don't think there's any because it's in any automated system, you have to have software, and I've never seen a case where you had to take each algorithm in the software and apportion that out. But even if you could, Ugone said there's no value separate and apart from the patents. How were you able to know that if Magellan had used your algorithm, they would use more butane and therefore save money? Did you actually find their figures somewhere? We knew their actual volumes, right? We had projections of what we could have done. Volume of butane used? Yes, so what they created using the infringing systems and their algorithm, we knew actual those volumes from that. Ugone chose to use those as his base for damages, which means whatever value was in our algorithm. So you then ran your algorithm against their system, so to speak? Yeah, Ugone had looked at that, but he said in order to address this as fairly to them as I could and take out any extra value, and I know I'm way over time, I don't want to lose my time. Before you, can we talk a little bit about the Rule 50 issue? What's that? Can we talk a little bit about the Rule 50 issue? Okay. And your argument is that there's a Rule 50 violation here, correct? So the briefs didn't really help us on deciding whose law applies here on the Rule 50 issue. It's the Third Circuit. Yes, I would agree. And do you know what the Third Circuit law is? I don't have that at the top of my head, but I will when I step back up. Well, it's the Williams case. Okay. And Williams says that if you didn't raise a Rule 50 violation argument before the district court, you've waived it. Can't raise it here. And we looked at the record, and you didn't raise a Rule 50 violation argument in front of Judge Andrews with respect to the butane limitation. Just to be clear, you are the party that raised the issue in the Rule 50B. You're arguing that you were entitled to JMAL. Do I have it in reverse? I think it's in reverse. Okay. So the question is whether it's preserved or not by the party that's challenging Judge Andrews' JMAL of infringement based on the issue not being raised in the 50A. So I think you're the party that raised the issue, right? Right, right, right, right. Your Honor, I have to look to answer that question. I don't want to answer it incorrectly, so I don't want to shoot from the air. It's a cross-appeal issue. Yeah. Okay. We'll talk about it on the cross-appeal. Let's go ahead and thank you. I'll restore some of your time. Let's hear from Ms. Fiorella. So Ms. Fiorella, maybe you could start with the apportionment damages issues and then consider the issue of waiver of the challenge under Rule 50B by failing to – well, I guess it's waiver – you're arguing that there was a waiver below by failing to raise an issue under Rule 50A before raising it in Rule 50B, but because you didn't raise it before Judge Andrews, whether that would be a waiver under Third Circuit law. But if you could talk about damages first, I think that would be a good place to start. Will do. Thank you, Judge Stoll. May it please the Court, Natika Fiorella on behalf of the cross-appellants. So jumping right into the EMBR and apportionment issues, our position is this Court should affirm all of the District Court's rulings on these issues because it went through and said that Sunoco simply had not met its burden, a very heavy burden on entire market value rule, to show that it applied, and then subsequently did not do the required apportionment, so its methodology was unreliable. What about lost profits for a minute? I think the argument is that because the Panduit factors are satisfied and some apportionment has occurred to the base, I guess, that there is no further apportionment that needs to be done. So we disagree with that. This is an issue that Judge Burke looked at as well because what they're looking at is the inventory graphics case, which essentially says that in some circumstances, satisfying factors one and two can build in the apportionment. The problem here is the way that this BSA-based methodology works. So even if we were to accept that you go and had satisfied the demand for the patented system, the first factor, and no non-infringing alternatives, which we dispute in real world facts show that there is a non-infringing alternative, but even if you were to take those two together, that would only show you the value of the patented system. And yet what they are calculating lost profits on is the value of the BSAs. So that's what Judge Burke identified at 8711 in his opinion, that the mentor graphic style of using the Panduit factors is not sufficient. And this court has recognized that as well in the Western Gecko case, where it said, you can't simply stop at one and two, if it's clear that there's more apportionment that needs to be done. And certainly here, since it is undisputed that the BSAs contain other elements that are valuable, Dr. Yugo needed to account for those. So that's why I would disagree that the idea of simply satisfying those two factors does not require Sunoco seems to argue to a certain extent that it is, you know, but for the infringement, which also use something like their BSA, they would have had the opportunity to enter into a BSA with this particular, with these particular customers. Why isn't that sufficient under our law on lost profits? You know, just as a, that's a lost opportunity for them. Sure. And, you know, there are some cases that address, if you were just not able to use your invention in any other way than in agreement or a contract with another person, then perhaps that's a factor that gets considered. But ultimately here, what happened is we can do everything else, right? The real world facts show that we don't need their services. We don't need their algorithm. We don't need their blending software. We don't need their design and construction. We just need their license. And what both Eugone and our expert were discussing is what's the value of that their license. So they're kind of assuming here that we wouldn't necessarily enter a BSA if not for the patents, but that actually dovetails into the entire market value rule because the evidence that they have for that is completely speculation and conjectural. They have very little evidence from actual customers that says, no, if not for these patents, we would not have entered the BSAs. It is the patents is why we're entering the BSAs. They need that link in order to... Even for lost profits. Even for lost profits, because fundamentally, what is the lost profits calculation and the reasons why this court has said that satisfying those factors can satisfy apportionment is because this is an idea that they reflect the value of the patented feature and nothing more. That's still the fundamental black letter law. Now, in some cases, perhaps you can get to that just the patented feature value using the lost profits analysis, but then you have to show that the patents are what drives the actual relationship. And that takes you to the EMVR analysis. Yes. Right. So you just heard your adversary believes that there was a clearly erroneous fact finding here. So what is your argument defending the judge's decision that there was a failure to prove EMVR? A few things, Your Honor. So first is the district court properly looked at what is the evidence that underlies their theory, that it's the patents and the patents solely that are the driver, not just... And this third party said, I really am hot for the patents. Sure. But even that just said, I rely on the strengths of the patents. That does not say that the reason, the sole reason that that customer, Chevron, decided to enter into the BSA is because of the patents. There is no testimony like that. In fact, Colella, one of their witnesses specifically talked about the expertise that Sunoco brings. Phillips 66 is a customer that they cite and they say, wait, this customer came to us because they couldn't get their infringing system to work. So again, it's expertise. It's their fact that they had been blending before. It's the way that they designed their systems. Evidence from them themselves is showing that the patents are not the sole driver. And so what the district court properly looked at at 822 and 823 is where is the evidence? If it's speculative and conjectural, laser dynamics says that's insufficient. But there's a second reason beyond just this evidentiary issue. And that is the actual methodology that Dr. Hugo used. What he did was say, and this is at 8-9-9-0 in the record. He lists out all of his services and what he says, he goes through and he says, the blending algorithm, for example, this one has, it maximizes the value of the blending because you're able to blend up to the butane limit. So you get lots of profits. So he's recognizing the value. But then he says, but no one would want that separate and apart from the patent. So I'm going to assign it no value. And also I'm going to say, it can't be what is the driver of demand. So we actually use that same analysis for both apportionment and EMDR. The problem is laser dynamics is extremely clear. It's not enough that someone wouldn't want the BSAs without the patent. It's not enough that someone wouldn't want the other features. You have to show it is the sole driver of demand. And there's simply no evidence on that. So we would say there's no abuse of discretion in the district court finding exactly that. Well, I didn't mean to harp on that. It sure looked to me like the EMDR was the Achilles heel for your adversary here. If he can break through that fact finding, then you're in trouble, certainly on the law of profit. I would agree that if they were able to satisfy that, it is a- Right. But it just seemed to me, what I look for in a case as complicated with this, is I look for, is there a turning point in the analysis? And it seemed to me that the court's finding that there was no showing that there was EMDR as to the patents. That means there is value to something else. And then I'm going to have a look and see where it's actually proven.  And that's our position. And I will just note that they had two chances at this, right? So Judge Burke at A8713 specifically says, oh, I'm sorry, Judge Cunningham? I think you're going to go towards one of the areas I want to explore with you anyway. So do you agree that you are not, you know, this is really not a collateral or back up situation with the Illinois ruling? Do you agree with that? And is that you're more so arguing the issue of inconsistency in terms of how the precedent will play out? I think it's both, Your Honor. And the reason I say that is because it really depends on how we identify the issue for collateral estoppel. And our point here is they have now, Sunoco has now, before the district court in Delaware twice, and before the Illinois court once, and before this court now, has said it's unapportioned BSAs are a proper basis of damages. So if we look at that as the issue, that issue has been thoroughly vetted and thoroughly rejected in many different situations. And if I could, I just have two points I'd like to note with respect to estoppel that we didn't get a chance to put in the briefs because it came in in theirs. The first is on this waiver forfeiture issue. This court's opinion did not come down until April 2022, which was after the trial in our case was already complete. And Uniloc says there is no forfeiture, you don't need to find forfeiture when you're simply waiting for the appellate process of the preclusive case to finish. So we don't think there's any forfeiture waiver here. But the second issue, I think, dovetails to your question, Judge Cunningham. And it has to do with, it's not just an inconsistent verdict, though we do think that there would be an inconsistent decision if they were allowed to re-argue this and then, Your Honors, were to come to a different conclusion. But the bigger problem is they are truly wasting judicial resources in our view because it's the same exact argument. So it's the same, I don't think... What about the fact that it's a different standard of review? And it's, you know, different in that one, the judge is acting as a gatekeeper and in the other, the judge is making a fact finding. That seems distinctly different to me for purposes of collateral estoppel. And certainly, Your Honor, I think that there are situations where that can make a difference. Here, though, first on standard of proof, I'll get to standard review in a second, but on standard of proof, they had to prove lost profits or reasonable royalty by a preponderance of the evidence before the fact finder in U.S. Venture. And they had to prove reliability of their expert methodology under Rule 702 by preponderance of the evidence. So standard of proof-wise, we're looking at the same thing. Standard of review-wise, this court, in affirming the U.S.V. decision, did do so for clear error for lost profits, but for reasonable royalty, both reviewed for clear error and abusive discretion because it was looking at the methodology, which is the same methodology between reasonable royalty and lost profits. So even the standard of review is actually not as distinct as it might seem. And then finally, one last point on this. This is a case of whether or not Dr. Hugon's theory was legally viable. So there were no more facts that you could have allowed in, that Judge Stark could have allowed in and gone to a jury that would have changed his legally unviable theory into a viable one. And that also dovetails into this idea that Judge Burke already gave Dr. Hugon a second chance. If he had more facts that he could have presented to show the entire market value rule was met, or that the apportionment would be good. Is the theory no good, or is the attempt to prove that the theory happened no good? Nobody gave us to try to decide whether, in the other case, Hugon was talking exactly the same language. So nobody gave me, in my appendix, the actual expert report that he put in in the other case. So I got apples and oranges to start with. I can't see what it is. And it seemed to me like here, his theory as to why he should have damages was proven to be failure-proof. Right? It was, but it was a failure. I don't know what his arguments may have been on apportionment in the other case, baked in apportionment or otherwise, because nobody showed me that. Understood, Your Honor. I guess what I would say to that is, the reason there was a failure of proof on the actual amount of damages is because Dr. Hugon was tying all the damages to the full 40% from the BSAs, or 50%. And that's the same thing that's happening here. We acknowledge that in the supplemental report, Dr. Hugon did take out one or two additional things, but he certainly did not account for everything that he himself admitted had value. So the theory is still an improper one. But, Your Honors, we do not need to find a staple in order to affirm on all the district court's rulings. We certainly think there was no abuse of discretion in any of them. So, on the Jay Mall issue, I was wrong when I said it was a cross-appeal issue. So, basically what happened here on the directed verdicts, but before the case went to the jury, your side moved for a directed verdict on both the gasoline and the butane limitations, right? Yes. And so, and that was oral. Yes, Your Honor. And we have all that in the transcript. Then, after the case, you file your 50B. Yes, Your Honor. In your 50B, your other side came in and objected to your 50B with regard to the gasoline side, and said, whoops, you can't do that, you've got a new grant. Exactly. They did not make that argument with regard to your butane. Right. In their 50B motion, in their response, they did not make this argument. Well, not only didn't they respond, they agreed that you had, with regard to the gasoline, there was one issue, but with regard to the butane, you had preserved that issue before the district judge on your oral motion. Yes. I mean, one of the things we're looking at is there are no district court fact findings on this issue, and normally in a waiver situation. The law under the Williams case in the Third Circuit is that if a party who is opposing a 50B, which Sunoco was here, and if the grounds for opposing it is a violation of the rule for new matter, the Williams case says that Sunoco has to raise that in front of Judge Andrews, saying, hey, there's a rule 50 violation. And if they don't raise that, which they did not do with regard to the butane limitation, they waive the right to raise it on appeal. Yes, I agree with that, Your Honor. Well, I know you agree, but I mean, neither one of your briefs cited the correct standard of review, which is using Third Circuit law. And neither one of your briefs cited the Williams case, which is a square precedent. I agree, Your Honor. In all candidness. So it leaves us and our law clerks to do the work for you, right? Yes, and I apologize for that. I apologize for that oversight. So I assume that your position now, although you didn't say so in your brief, is that Sunoco has waived the right to raise its challenge to the 50B. Yes, that is, when I was preparing for the argument, that was going to be my opening line, because I apologize it was not in the brief. But yes, that is our position. OK, did you have anything you wanted to say on your cross-appeal? I would. I know I'm running out of time, so I'll make it quick. We believe that this court should find all the claims invalid under 101. And you can look just at the claims. At A122, we see the claims for the 629 patent. They start with a computer-implemented method for blending. And then each step in the method is simply relating to receiving, calculating, or transmitting steps. These are the types of data-focused claims that this court has previously held to be invalid. Now, one thing that I think is interesting is trying to understand what is the— Which claims in particular do you think are your strongest claims for an ineligibility argument? Because they're definitely varying degrees. I agree. I think the 629 claims are the strongest. So claim 31 is probably one of the strongest. I think the 686 claim 3 is also extremely strong. I mean, to be honest, Your Honor, although they are different, it's the same underlying issues. I know that's your position. I just want to know which ones you think now are strongest. So let me change that order. I'll say 686 claim 3 is first, and then the 629 claims. OK. And I'll save the rest of my time for rebuttal. Thank you. Thank you. OK. Mr. Cavill, I will give you four minutes. Restore four minutes. Thank you, Judge Sloan. Judge Clevenger, looking back at the briefs to understand that issue on the waiver, as I understand what happened, and I recall it, they raised a new ground post-verdict on their 50B that they hadn't raised before. What new ground is that? The issue of transmitting or receiving. And they had not raised that previously. Well, that's within the heart of the butane limitation. And I was looking at your brief. Did you bring your brief that you filed on this subject matter? Specifically, your opposition brief in the district court. I do not have that with me. Which we have reviewed. OK. When they raised that orally at the hearing, this new issue, we filed a letter saying that shouldn't have been raised. And in reply, we raised Rule 50. That was documented. I see the letter. I've read your letter, which is in the appendix. OK. But it says nothing about how. It says they're raising a new claim construction issue. Right. It doesn't say that they are raising an issue, a non-infringement issue, that they failed to raise in their Rule 50A motion. That argument is not made. And if I'm wrong, please point it out to me in the appendix. No, I understand. To me, in saying that we interpret the claims this way, when they hadn't said it before. That's a claim construction issue. That's not saying that they didn't raise it in Rule 50A motion. It's not giving notice to Judge Andrews of your position. In your answering brief to their motion, their 50B motion, you, and when they're talking about the gasoline vapor pressure, you say, defendants never moved for JMOL on the gasoline vapor, but instead only on the rack and, quote, butane vapor pressure limitations. Right. Which is not the transmitting issue that they've tried to use as their hook for non-infringement. Why isn't it? Because that's a separate issue. One is measuring, and one is how you deal with either the baked-in butane vapor pressure or the actual vapor pressure. And I would say this. The JMOL is still wrong because there is expert testimony on infringement, and that is substantial evidence that the court could not overcome on JMOL. So I would say that even regardless of the waiver argument, the JMOL still needs to be reversed. I would say, back to damages, the Western GECO case is inapplicable in that you had survey equipment that was tied to the patents, and then you had profits from that, from the surveys, and then you had ship rental profits. And the issue was, how do we split that up? You don't have that here. Everything in the BSAs is either making or using the patented invention. And the making, they talked about construction costs. You don't deal with that because the way these were all negotiated with actual parties, including them, is we start with a 50-50 split of the net profits when costs are out. If you're going to put up the money to construct, then it may change closer to 40-60, and that's what you don't apply here. Is your argument convoyed sales? Is that how you distinguish Western GECO? I would say that's one of the things for sure. But in Western GECO, it was an issue where you couldn't say the ship rental was the patented invention. You needed a ship rental in order to tow the assembly and do the survey, but you couldn't say the ship rental was the patented invention. Here, making the patented system is a patent right, and so is using the system, which is the software and the algorithm and all of that. And where in Western GECO's reports do you think you sufficiently support the argument on convoyed sales? Can you give me a page? Yes. Can you find that page while I finish, Michelle? Thank you. And I would just note that when I looked at his report, I do see two arguments. This is a supplementary report maybe on convoyed sales, but it's only for two of the features of the SBA. It's not for all of the features that are the patent. Right, and he went through each feature, and he said some of these I would apportion out if forced to. Some of these I would say are convoyed sales. Some of these have no value outside the patent. So I think he did it. And what they just said, what I heard, is they negotiated for a BSA. The experts disagreed. And all of those issues are issues that should have gone to the jury, the disagreement of the expert. The issue is admissibility, whether the expert opinion should have been admitted, not whether the court agreed with them. And I would cite to the Apple case, which we cited on our yellow brief at 4. Do you have the convoyed sales site for Judge Pong? Do you have it? I think 5165 is one place. What's that? 7565. Can I ask a question on the 101 issue? Yes. So your adversary says on the 101 issue with regard to the 302 patent, to decide whether the claims asserted are invalid, I should just look at basically claim 1716 on the 302 or claim 3. I should ignore the independent claims from which the dependent claims depend. So if you would, for purposes of the argument, let's half of the claim, claims in the 302 were held invalid in Texas. Yes. Right? Yeah. So if you look at the way your adversary is looking at this, they're saying, well, the parts of the claim are invalid in Texas. We're sort of the structure. It was the equipment and all that stuff that would be legit, leaving you only with basically transmitting, analyzing, and the rest. So if I'm looking at the 302 claim invalidity issue and I only focus on 161703, it's a very different analysis than if I'm focusing on the entirety of the claim. Yes. And in here, let me just address Texas. In Texas, on summary judgment, the district court looked at Kerr-McGee, and that's his basis for finding a conventional. In this case, they had asserted Kerr-McGee was an invalidating reference. In that trial, they didn't raise it. And right before jury argument, they said, we're dropping Kerr-McGee. So none of the evidence came in on Kerr-McGee. And so Kerr-McGee, we can test, has nothing to do with the 101 analysis. It was a failed experiment. I understand that. But what we have is we have a final judgment by a district court that invalidates claims 1, 12, and 13. And once those claims are invalidated, they're gone. You would have no right to assert the right to exclude with regard to those limitations. As to those claims with nothing else, yes. And those claims were not in- So if somebody comes along later and says, well, you want to charge someone with infringing claims 16 and 17, the defendant would say, well, you know, I haven't violated the guts of the claim because it was held invalid. And the only remaining part of claims 302 that's legal are the dependent portions. The basis for the invalidation, so these actually, those claims 1, 12, and 13 were invalidated in Chicago on the basis that the court said, as I read these claims- I'm talking about the anticipation- Right, that's what I'm saying. So the question is this. Yes. Does that ruling have any impact on the 101 analysis here? And what impact would it have? It would have no analysis, it would have no impact because the only argument would be, well, that was conventional on the basis of Kerr-McGee. And there is no evidence that Kerr-McGee is conventional. The court found in Chicago that those were anticipated by Kerr-McGee because those claims did not have automation. All of these other claims that we're talking about are very different. No one disputes they have automation. But the basis for the anticipation holding in Chicago was that she did not find the automation was in those claims- In Chicago or Texas? But was in the dependent claims. In Chicago or Texas? 1, 12, and 13 are Chicago. Okay. Yes. For that patent, yes. But there was a representative claim. No. In fact, we did the opposite. And down below, they had argued for representative claims. We said there was no representative claim. And the district judge did not look at any claim as representative. So no, those claims, there's never been an agreement or a finding that their claims are representative. And I would say one other thing on the 101. The district court's opinion denying the 101 motion, which defendants neglected to attach to their red brief, was a Rule 52C fact finding. And it made detailed and specific findings of fact under Rule 52C regarding what are conventional methods for blending, regarding how Sunoco's invention improved those conventional methods, and concluding that the claims are directed to specific technical systems and methods that allow a distributor to blend more gasoline than would be possible with prior art. That's a legal finding, right? Yes. I mean, whether something's conventional is a fact finding, but whether something is eligible or what the claim is directed to, that's an ultimate legal finding. Ultimately, yes. And what I'm saying is they did not even mention his Rule 52C findings, where he had specific factual findings to support his opinion. So I think all you can do is affirm his 101 denial. OK. Thank you. Any further questions? Any further questions, Judge Cunningham? OK. Fiorella, I will restore your rebuttal time. Thank you, Your Honors. That's three minutes. So on 101, I think actually along the lines of the discussion we were just having, our with highlighting the anticipation finding was simply to show that if you're looking at what the heart or focus of Claim 3, for example, let's take that. Claim 3 of the 302 patent, what's the heart and focus of that claim? It can't be stuff that was already found to be in the prior art findings that Sunoco never challenged. So our point was to help the court understand or help look at what is the focus of the claim. It's not going to be the tank of butane, the tank of gasoline, the physical system structures. And then what I heard Mr. Kevel just say is the reason why the Claim 3- But you agree that it could be the other steps on this structure, right? Completely agree. And actually what I think Mr. Kevel just said makes our point, which is what he identified the difference was is automation. He said Claim 3 was not invalid for, you know, as anticipated by Kerr-McGee because it adds automation. But automation, this court has consistently said, is not enough to transform a otherwise abstract idea into a non-abstract one. Now Judge Andrews said it's not just automation and that could have been shorthand there, that automation reference.  But he said there were all sorts of things and advantages and distinctions from the prior that results from the way in which the claim performs this automated method. Yes, Your Honor. I completely agree. That's what Judge Andrews said, but that's not in the claims. Respectfully, we walked through in our brief where neither of the two advantages that are certainly described in the specification, they're just not in the claims. And that's what makes this case more along the lines of the charge point in Accenture type cases where you might have an invention in the specification, but it's just not claimed in that way. And so that's why we believe that although Judge Andrews' discussion on these things, had they actually been in the claims, we'd be having a different discussion. And on that point, I just want to point out one. It's the continuous control. I just wanted to point out one thing in the appendix that I think makes the point of why the continuous control aspect is not in the claims. Sinoco came back in their brief and said the continuous control aspect is found in the process control unit. That is the thing in the claims that gives you this concept of continuously controlling the blend ratio. Two points. First, process control unit is only in the 302 claims. It's not in the 629 claims. So we can't be looking at that specifically for the 629 claims. But second, and more importantly, at A172 in the 302 patent, column 7, line 61 to column 8, line 6, the patent specifically says the vapor pressure need not be measured continuously. In fact, you can measure it every 6 to 15 minutes. And then it goes on to say, whenever such measurements are made, the process control unit receives the measurements, recalculates the ratio, and does the blending. So the specification is clear that process control unit is not limited to this continuous control aspect, and that's the only thing that they've pointed out could possibly confer this benefit into the claim. Do you have any questions? Judge Cunningham? Okay. Thank you very much. We appreciate argument made by both counsel today. The case is submitted on the briefs.